**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **CHARTER SCHOOLS USA AT BERKELEY, LLC,** | Civil Action No. <u>2:25-cv-01852-BHH</u> |
| **Plaintiff,** | |
| **vs.** | **COMPLAINT** |
| | **(JURY TRIAL DEMANDED)** |
| **BERKELEY CHARTER EDUCATION ASSOCIATION, INC.; and THE CHARTER INSTITUTE AT ERSKINE, INC.,** | |
| **Defendants.** | |

Plaintiff, Charter Schools USA at Berkeley, LLC ("CSUSA"), complaining of Defendants, Berkeley Charter Education Association, Inc. ("BCEA"), and The Charter Institute at Erskine, Inc. ("CIE"), and alleges as follows:

1.       This is an action by CSUSA, an education management organization ("EMO") that has developed and manages approximately 150 high-performing charters schools across the country, against BCEA for breach of the management agreements for two of the schools BCEA operates.

2.       As described more fully below, CIE has induced BCEA's breaches of the management agreement as part of its ongoing effort to unlawfully compete with CSUSA and to interfere with CSUSA's contractual relations. Although CIE purports to serve as a charter school "Sponsor" that is authorized to issue charters, CIE is, in fact, a market participant that seeks to sell management services to the charter schools it is supposed to oversee. CIE has now misused its position to target and seek to eliminate numerous management companies as competitors for the

1

services it hopes to sell schools by disseminating misinformation and threatening to close schools or withhold funds if schools do not succumb to its unlawful demands. These actions have now resulted in numerous lawsuits against CIE.

3.     Significantly, CIE lacks legal authority to act as a charter school Sponsor. Under the South Carolina Charter Schools Act, S.C. Code Ann. § 59-40-10, *et seq*. (the "Act") only local school districts, the South Carolina Public Charter School District, and public or private "institutions of higher learning" can issue charters and serve as a charter school "Sponsor." CIE, however, is not an institution of higher learning. Although it shares the name "Erskine," CIE is a separate entity with a separate corporate existence from Erskine College ("Erskine"). For that reason, it cannot validly serve as a Sponsor under the Act.

4.     CSUSA has accordingly filed this action to not only recover the damages it has suffered as a result of BCEA and CIE's actions, but also to obtain a declaratory judgment confirming that CIE is not, and cannot be, a Sponsor under the Act.

## PARTIES, JURISDICTION, AND VENUE

5.     Plaintiff CSUSA is a limited liability company formed under the laws of the state of Florida. CSUSA is headquartered in Fort Lauderdale, Florida, and registered to do business in the State of South Carolina. CSUSA's only members are citizens and residents of the State of Florida.

6.     Defendant BCEA is a private non-profit corporation, incorporated under the laws of South Carolina, with its principal place of business in Charleston, South Carolina.

7.     Defendant CIE is a South Carolina non-profit corporation, with its principal place of business in Columbia, South Carolina.

8.     This Court has jurisdiction pursuant to 28 U.S.C § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendants, and the amount in controversy

exceeds $75,000. Diversity of citizenship exists because Plaintiff is a citizen of Florida, while Defendants are citizens and residents of South Carolina.

9.      This Court has personal jurisdiction over the Defendants who are citizens and residents of South Carolina and thus subject to general jurisdiction here.

10.     Pursuant to 28 U.S.C. § 1391, venue properly lies in this Judicial District because Defendants reside in this District.

## FACTUAL ALLEGATIONS

11.     BCEA currently operates three charter schools pursuant to charters purportedly issued by CIE—(i) Mevers School of Excellence, located in Goose Creek ("MSE"); (ii) Berkeley Preparatory Academy, located in Summerville ("BPA"); and (iii) Willie Jeffries School of Excellence, located in Orangeburg ("WJSE").

12.     BCEA was founded in 2016 by a group of community members led by Samuel Rivers, Jr., a former member of the South Carolina House of Representatives, and Minnie Newman Blackwell Mevers, the former Mayor of Hanahan and a life-long educator, to provide expanded educational opportunities to children in and around Berkeley County.

13.     Rivers and Minnie Mevers helped to organize BCEA's initial board of directors. After BCEA partnered with CSUSA, Minnie and her husband, Sonny Mevers, provided an initial donation of $3 million dollars to help establish MSE. This donation was restricted to MSE and was only to be used for MSE's benefit.

14.     Before it applied for charters to open MSE and BPA, BCEA engaged CSUSA assist it in preparing the applications for the schools and to provide management and operational services for the schools once the charters were granted.

15.      CSUSA is an education management organization that contracts with non-profits to develop, manage, staff, and operate public charter schools.  BCEA selected CSUSA because of

3

its experience, reputation, and proven-track record developing and operating high-performing charter schools.

16.     BCEA was initially granted a charter to open MSE in 2016 by the South Carolina Public Charter School District.  BCEA  first opened MSE to students in 2017.

17.     BCEA subsequently requested and received approval to transfer the charter for MSE to CIE, effective July 1, 2018.

18.     In or around the same time it sought approval to transfer MSE's charter, BCEA, with the assistance of CSUSA, submitted an application to CIE for the school that became BPA. BPA first opened to students in August 2021.

### BCEA Enters Management Agreements with CSUSA

19.     BCEA and CSUSA's relationship is governed by written Management Agreements for both MSE and BPA.

20.     A true and correct copy of the Management Agreement between BCEA and CSUSA for MSE, dated August 8, 2016 (the "MSE Management Agreement") is attached hereto as **Exhibit A**.

21.     A true and correct copy of the Management Agreement between BCEA and CSUSA for BPA, dated December 31, 2020 (the "BPA Management Agreement") is attached hereto as **Exhibit B**.

22.     The MSE Management Agreement and the BPA Management Agreement have the same material terms, and accordingly are referred to herein as the "Management Agreements."

23.     The Management Agreements provide for an initial term that corresponds to the term of each respective school's Charter Contract. After that initial term, the Management Agreement provides that the term will be extended by additional term(s) corresponding to the term of any renewed or replacement Charter Contract. (*See* Management Agreements, § II.)

4

24.     Under the Management Agreements, BCEA agreed that, among other things, CSUSA would:

    a.  Provide "all labor and supervision necessary for the provision of educational services to students, and the management, operation, and maintenance of the Charter School" in accordance with the educational goals, curriculum, and methods established by BCEA's board of directors and the Charter Contract between the BCEA and the School's Sponsor;

    b.  "[I]mplement the Educational Program" of the school;

    c.  "Perform day-to-day management of the Charter School . . .";

    d.  "Implement and administrate the Educational Program, including the selection of instructional materials, personnel, equipment, technology and supplies . . . .";

    e.  "Perform repeated evaluation, assessment and continuous improvement of the educational curriculum and program and report the findings to [BCEA] . . . .";

    f.  "Manage personnel functions, including professional development of the Charter School Administrator and instructional personnel . . . .";

    g.  "Manage[] the business administration of the Charter School."; and

    h.  Marketing the Charter School to prospective students and families.

(*See* Management Agreements, §§ I.B., III.B., III.C.)

25.     In addition, the Management Agreements provide that "CSUSA shall select and hire qualified personnel to perform services at the Charter School" and that "[p]ersonnel shall be employees of CSUSA, unless otherwise agreed by CSUSA and [BCEA]."  (*See* Management Agreements, § VI.A.).

26.     The Management Agreements also include specific provisions addressing the School Administrator (or principal) for each school in Section VI.B.  That section specifies that "CSUSA shall have the authority, consistent with State law, to select and supervise the School Administrator," providing in full:

    **B. School Administrator**. The accountability of CSUSA to the Charter School is an essential component of this Agreement. Since the responsibility of the School Administrator is critical to the

5

> Charter School's success, CSUSA shall have the authority, consistent with state law, to select and supervise each School Administrator and to hold the School Administrator accountable for the success of the Charter School. CSUSA shall consult with the Board with respect to the hiring of the School Administrator, and CSUSA shall remove the School Administrator from the Charter School if the Board is reasonably dissatisfied with his or her performance.

(*See* Management Agreements, § VI.B.)

27.     The provisions requiring that the School Administrator be a CSUSA employee and that CSUSA must have authority to select and supervise the School Administrator are critical terms for CSUSA. Under the Management Agreements, CSUSA is responsible for the management, operation, and performance of the schools, and the agreement makes CSUSA accountable to the Board for the achievement of certain performance goals.  Being able to select and supervise the School Administrators ensures that CSUSA will have sufficient control over the schools' operation to perform its obligations under the agreement, which is the very purpose identified in the express language of Section VI.B. of the Management Agreements.  If the agreements provided otherwise, they would essentially make CSUSA responsible for the performance of teachers and staff directed by someone else.

### CIE's Purports to Act as a Charter School "Sponsor"

28.     As stated above, CIE purportedly serves as the "Sponsor" of all three charter schools operated by BCEA.

29.     The Act requires charter schools to operate pursuant to a Charter Contract issued by a "Sponsor," which serves as the school's authorizer. Initially, only local school districts and a statewide entity, known as the South Carolina Public Charter School District, were able to serve as Sponsors under the Act.  However, in 2012, the Act was amended to allow public or independent institutions of higher learning to serve as Sponsors as well. *See* S.C. Code. Ann. § 59-40-40(1).

6

30.    Over the past two decades, Erskine has struggled financially.  In December 2022, the Southern Association of Colleges and Schools Commission on Colleges ("SACSCOC") denied Erskine reaffirmation of its accreditation and placed Erskine on warning status for, among other things, failing to meet SACSCOC's standards for governance, financial resources, and financial responsibility.  Although SACSCOC announced in December 2024 that it would allow the school to remain accredited, it continued to keep Erskine on sanction. SACSCOC did not grant reaffirmation and take Erskine off sanction until January 17, 2025.

31.    Leading into 2017, Erskine decided to take advantage of the recent amendments to the Act and enter the market as a Sponsor of charter schools.  Erskine did so because, among other things, it believed that serving as a Sponsor would present a revenue-generating opportunity. Under the Act, charter school sponsors are permitted to retain a percentage of the per-pupil funding the State provides the charter schools they authorize as a "Sponsor Fee."

32.    However, Erskine does not serve or function as a Sponsor.  Instead, _CIE_, rather than Erskine, has purported to serve as charter school Sponsor, approving charter applications and issuing Charter Contracts in CIE's name, based on votes of CIE's board of directors.

33.    CIE, however, is not an "independent institution of higher learning." Instead, CIE is separate from Erskine, with a separate corporate existence and separate board of directors.

34.    Because CIE is not a "independent institution of higher learning" it is legally prohibited from serving as a charter school Sponsor under the Act.  Accordingly, any actions CIE has purported to take as Sponsor, including the charters it has purported to issue, or amendments it has purported to approve, are _ultra vires_, invalid, and void.

35.    Further, as described below, CIE competes in the market for charter school management services in addition to purporting to serve as a Sponsor.

7

36.     CIE's actions alleged in this complaint were taken in its role as a participant in the market for charter management services, and not in its purported role as Sponsor. Thus, even if CIE could validly serve as a Sponsor under the Act—which it cannot—its actions as alleged in this Complaint would not represent official actions taken in relation to the charter schools, but instead the actions of a private corporation and market participant.

### CIE's Unlawful Competition against Charter Management Companies

37.     Even though it cannot legally serve as a Sponsor, CIE has actively marketed and promoted itself to new and existing charter schools, encouraging them to either submit applications to CIE as a Sponsor or to transfer their existing charters from other Sponsors to CIE, all in an effort to drive additional revenue for CIE, its principal executives, and other related companies.

38.     Indeed, BCEA chose to transfer the sponsorship of the charter for MSE, to CIE as a result of CIE's promotional efforts.

39.     Since CIE's formation, CIE has also sought to unlawfully compete against the management companies and other contractors that provide services to the charter schools it claims to Sponsor.

40.     CIE initially sought to compete with the management companies that serve CIE-sponsored schools through other, related entities.

41.     In or around 2019, Erskine agreed to invest an initial $1 million in a newly-formed EMO, Reason & Republic, LLC ("Reason & Republic") in exchange for a stake in Reason & Republic's ownership. CIE then approved amendments to the Charter Contracts for three of the schools it oversees—Summit Classical Charter School, Inc., Belton Preparatory Academy, and South Carolina Preparatory Academy (collectively, the "Reason & Republic-Managed Schools")—to approve their engagement of Reason & Republic as their management company.

42.   In January 2023, CIE's Superintendent, Cameron Runyan, and its Chief Operating Officer, Vamshi Rudprapati, founded Teach Right USA as a service provider to charter schools.

43.   Although Runyan and Rudprapati formed Teach Right USA as a nonprofit corporation and claimed it was only intended to provide education and professional development for teachers, the true purposes of Teach Right USA were to provide education management services that compete with other for-profit EMOs and to develop and manage charter schools in states other than South Carolina. Teach Right USA improperly used personnel under the employment of CIE to accomplish these purposes.

44.   In October 2023, Teach Right USA filed a Letter of Intent with the Tennessee Department of Education to open a school in Knoxville, Tennessee. The filing lists Runyan, Rudprapati, and William Roach (a former CSUSA employee), all of whom were current employees of CIE, as the "leadership" of the proposed Teach Right School.

45.   Upon information and belief, CIE has wrongfully used South Carolina state funding received in its purported role as Sponsor to fund Teach Right USA, either directly or indirectly. This included using State funds to pay for trips by CIE staff, including Runyan, Rudrapati, and others to Tennessee to lobby Tennessee officials to support their applications to open schools there.

46.   CIE's activities thus have not been limited to the advancement of charter school education in South Carolina. Rather, it used both Reason & Republic and Teach Right USA to bring about additional compensatory operations in South Carolina, Tennessee, and perhaps other states, to benefit CIE, Erskine, and CIE's principal executives.

47.   In or around 2021, however, CIE and Erskine changed course by seeking to unwind Erskine's ownership interest in Reason & Republic—a process that has still not been completed—and instead started using CIE to directly compete against the management companies and other

9

providers that serve the schools CIE oversees in its purported role as Sponsor.   CIE does so by offering various management services to charter schools under what it calls a "shared services model." Under this model, CIE sells services to the charter schools purportedly sponsors which compete with those offered by the schools' management companies and other service providers, in exchange for the payment of additional fees to CIE.

48.     After launching its shared services model, CIE targeted Reason & Republic, misusing its role and authority as Sponsor to threaten and induce the Reason & Republic-Managed Schools to breach their management agreements with Reason & Republic and instead purchase competing services from CIE and/or Teach Right USA. These efforts included (i) threats to withhold state funding unless the Reason & Republic-Managed Schools complied with CIE's demands to displace Reason & Republic; (ii) spreading disinformation regarding Reason & Republic's ability to manage the Reason & Republic-Managed Schools; (iii) falsely alleging that Reason & Republic's management of the schools constituted a violation of state law; and (iv) sewing dissention toward Reason & Republic both directly through CIE's own statements and through social media accounts operated by CIE employees.

49.     Among other things, CIE's acts of unfair competition against Reason & Republic included: (i) falsely informing board members of the Reason & Republic-Managed Schools and parents that Reason & Republic was mismanaging school funds; (ii) demanding that the Reason & Republic-Managed Schools appoint CIE as their "fiscal agent," and threatening to withhold state funding if the schools refused; (iii) falsely stating that enrollment of the Reason & Republic-Managed Schools' employees in the South Carolina Public Employee Benefit Authority ("SCPEBA") was unlawful and constituted "fraud"; (iv) falsely alleging that Reason & Republic had chosen an auditor for the schools who was not authorized to practice in the State of South

Carolina and demanding to conduct "forensic audits" of the schools' finances; (v) encouraging the boards of the Reason & Republic-Managed Schools to assert that Reason & Republic had breached its management agreements based on the same false assertions CIE and Erskine communicated to the schools and their boards; (vi) soliciting and hiring away the Reason & Republic-Managed Schools' principals to work for CIE, and then' to using their inside knowledge of Reason & Republic's operations to induce the schools to breach or terminate their management agreements and instead purchase competing services directly from CIE.

50.     To accomplish its goal of eliminating Reason & Republic as a competitor, CIE regularly held secret, closed-door meetings with the boards of the Reason & Republic-Managed Schools in violation of the South Carolina Freedom of Information Act, S.C. Code Ann. § 30-4-10, *et seq*. ("FOIA").  South Carolina's version of FOIA requires that the board of directors for a charter school act only as a whole at a duly noticed meeting, with the opportunity for the public to observe the communications of the board and its deliberations.  *See* S.C. Code Ann. § 30-4-60.  It similarly requires that public bodies, including charter school boards, publish an agenda prior to any board meeting disclosing the matters about which the board might receive information or take action.  *See* S.C. Code Ann. § 30-4-80.  Despite this, CIE repeatedly met with the boards of the Reason & Republic-Managed Schools in closed sessions, without disclosing the purpose of the meetings, in order to make false and defamatory statements about Reason & Republic, interfere with Reason & Republic's management of the charter schools, and to induce the board to breach or terminate its management agreements with Reason & Republic

51.     Through these wrongful acts of unfair competition and abuse of its role as purported Sponsor, CIE was able to effectively and tortiously interfere with Reason & Republic's management of, and contractual relationships with, the Reason & Republic-Managed Schools.

CIE's purpose in doing so was to eliminate Reason & Republic as a competitor in the market for charter school management services.

52.     In response to their misconduct, Reason & Republic and its parent, Icelaven, have filed claims against CIE, Erskine, and CIE's principal officers, for tortious interference with contract, violation of the South Carolina Unfair Trade Practices Act, S.C. Code. Ann. § 35-5-10, *et seq*., and violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*.  A true and correct copy of the claims filed by Reason & Republic and Icelaven, which are proceeding in the action *Erskine College, et al. v. Icelaven Devel. Group., et al*., Case No. 2024-CP-04-00995, Anderson County Common Pleas, are attached hereto as **Exhibit C**.

53.     Notably, Reason & Republic and Icelaven are represented in their lawsuit by the same lawyer that has represented BCEA in its dealings with CSUSA, and thus BCEA is aware of CIE's wrongful tactics and use of disinformation to interfere with management companies serving the schools CIE purports to Sponsor.

54.     As another example of CIE's misconduct, during the period between 2020-23, CIE engaged in a similar campaign against Pinnacle Charter School Management Group, LLC, an education management organization that provides services to three charter schools CIE previously purported to Sponsor—Gray Collegiate Academy, Oceanside Collegiate Academy, and Legion Collegiate Academy (together, the "Pinnacle-Managed Schools").

55.     Just as it had with Reason & Republic, CIE and its principal executives, including Runyan, engaged in a campaign to interfere with Pinnacle's agreements with the Pinnacle-Managed Schools and unfairly compete against it, by, among other things, (i) falsely accusing Pinnacle of mismanaging the Pinnacle-Managed Schools' finances; (ii) conducting secret meetings with the boards  of the Pinnacle-Managed Schools in violation of FOIA to spread false  and

defamatory information regarding Pinnacle; (iii) falsely accusing board members of the Pinnacle-Managed Schools who sought to oppose CIE's actions of conflicts of interests as a to pretense to take disciplinary action against the schools;  (iv) inducing or purporting to require the boards to adopt "policies" that violated the terms of Pinnacle's management agreements and interfered with its management of the Pinnacle-Managed Schools; (v) using the threat of disciplinary action against the schools' charters to force the schools to comply with its demands to displace Pinnacle; (v) voting to close one of the Pinnacle-Managed Schools based on its false accusations that Pinnacle had mismanaged the school's finances; (vi) paying current Pinnacle employees to serve as "consultants" for CIE to induce them to work against Pinnacle's interests; and (vii) inducing the boards of the Pinnacle-Managed Schools to send letters (written by the same lawyers and law firm that have represented BCEA in its dealings with CSUSA) falsely accusing Pinnacle of breaching the terms of its management agreements.

56.     CIE, Erskine, and Runyan's misconduct have now resulted in numerous lawsuits against them by Pinnacle and the schools it manages. *See, e.g., Pinnacle Charter Management Group*, LLC v. Charter Institute at Erskine, Inc. et al., Case No. 2020-CP-4004914, Richland County Common Pleas; and *Legion Collegiate Academy vs. Erskine College*, et al., Case No. 2022-CO-4003170, Richland County Common Pleas.

57.     Upon information and belief, CIE and its principal executives, in particular Runyan and Rudrapati, have used CIE and Teach Right USA to unlawfully benefit themselves.  As has been reported in the press, CIE, Runyan, Rudrapati, and others have used CIE to operate a "pay-for-play" scheme—soliciting money and donations from  contractors, developers and vendors who hope to do business with the charter schools CIE Sponsors to, among other things, fund lavish trips abroad that serve little if any educational purpose and do not serve the interest of South Carolina

charter schools.  *See* Zak Koeske, *SC School District Spent $200k on Out-State-Trips, Including 5-Day Tour of London*, THE STATE, Feb. 28, 2025.

58.     Upon information and belief, one of the reasons CIE has begun to target CSUSA and sought to eliminate it as a competitor is that CSUSA has not provided CIE and its leadership similar kickbacks.

## CIE's Interference with CSUSA's Development of Rock Hill School for BCEA

59.     Just as it has with other management companies, CIE has now focused its efforts on CSUSA and the schools it manages for BCEA in an attempt to (i) interfere with CSUSA's prospective and contractual relationships with BCEA and (ii) displace CSUSA as a competitor for the charter management services.

60.     Leading into 2019, CSUSA and BCEA discussed opening a third charter school, which CSUSA would again help to market and develop, and for which CSUSA would serve as EMO.  As a result of these discussions, CSUSA helped BCEA prepare an application to open a school in Rock Hill that was to be known as Rock Hill Preparatory Academy ("RHPA").

61.     CSUSA and BCEA also discussed opening schools in other locations, and BCEA began working with CSUSA's affiliate, Red Apple Development, to identify potential real estate that could be developed into additional school sites.

62.     In February 2019, BCEA submitted an application to CIE for RHPA.  The application stated that RHPA would be managed by CSUSA.  In the application, BCEA further explained that it currently contracted with CSUSA for MSE and that "[w]e have been working closely with CSUSA's development, education, finance, and operations teams, and are satisfied with the delivery of services, and we plan to continue this partnership with CSUSA for our future

schools." BCEA similarly lauded CSUSA for having "a large support staff that provides services across all areas of expertise needed to successfully operate a charter school."

63.     On April 10, 2019, CIE's board of directors approved BCEA's application for RHPA.

64.     During the period from 2020 to 2022, William Roach served as CSUSA's State Director. Roach also served as the founding principal of BPA.

65.     In the May 2022, however, CIE solicited and hired Roach away from CSUSA to serve as CIE's Chief of Special Projects. Upon information and belief, CIE used information that it gathered in its purported role as Sponsor, including information about Roach's salary and benefits, to solicit Roach to breach his contract with CSUSA and come to work for CIE.

66.     Upon information and belief, CIE hired Roach to sell management services to charter schools, including schools CSUSA manages, as part of CIE's "shared services model." In particular, CIE wanted Roach to solicit BCEA to hire CIE and/or Teach Right USA to provide charter management services for its new school, rather than CSUSA.

67.     In and around this same time, BCEA requested that CIE allow it to amend its application for RHPA to (i) change the location of the school from Rock Hill to Orangeburg and (ii) eliminate CSUSA as the school's proposed management company.

68.     In June 2022, shortly after CIE hired Roach away from CSUSA, BCEA's board of directors conducted a meeting in which it first met in closed session and then voted to (i) change the name of RHPA to Willie Jeffries School of Excellence and (ii) purchase charter management services from CIE under its "shared services" model.

69.     On or about November 16, 2022, BCEA's board conducted a closed session without first disclosing the purpose of the closed session as required by FOIA. Upon information and

belief, BCEA did not conduct any business for which FOIA would have allowed it to go into closed session, but instead used the session to meet with representatives of CIE and/or Teach Right USA to discuss the engagement of CIE and/ Teach Right for management services—purposes for which a closed session are not allowed under FOIA.

70.     CIE subsequently granted BCEA preliminary approval to open WJSE in or around April 19, 2023, and BCEA opened the school to students in August 2024.

71.     Since CIE approved the application for WJSE, BCEA has persistently conducted business regarding the school in closed session, in violation of FOIA and without following the procedures required under that act.

72.     Despite BCEA's efforts to conceal its actions, BCEA adopted a budget for WJSE on June 27, 2023, that included an appropriation for "management services," which, upon information and belief, reflect services it purchases from CIE.

73.     In addition, BCEA has misappropriated what remains of the $3 million donation provided by Minnie and Sonny Mevers.  Although the Mevers restricted that donation for the benefit of MSE, BCEA has used the proceeds of the Mevers' donation to fund WJSE.

**BCEA Breaches Management Agreements
for MSE and BPA**

74.     Since CIE convinced BCEA to abandon its plans for RHPA and instead hire CIE to provide services for WSJE, BCEA has repeatedly breached and sought to wrongfully terminate its Management Agreements for MSE and BPA.

75.     Over the same time, CIE has continued to encourage and induce BCEA to breach the Management Agreements.  In doing so, CIE has used the same playbook it used with Reason & Republic and Pinnacle—spreading false and defamatory information regarding CSUSA and interfering with CSUSA's management of MSE and BPA, all in an effort to induce BCEA to breach

or terminate its management agreements with CSUSA and buy services from CIE and/or Teach Right USA instead.

76.     Despite expressly agreeing that CSUSA would directly employ and supervise the School Administrators for MSE and BPA, BCEA has persistently sought to interfere with CSUSA's supervision of the School Administrators and instead attempted to exercise direct control over the School Administrators and their staff in contradiction of the Management Agreements.

77.     To that end, the current chair of BCEA's board of directors, Stewart Weinberg, has persistently interfered with CSUSA's management of MSE and BPA and the School Directors. Since becoming chair, Weinbberg, acting both on his own and in concert with other board members, has repeatedly undermined the authority of the School Administrators, issuing directives that contradict those issued by the School Administrators or CSUSA.  He has also sought to sew dissention and discord among BCEA's board, the School Administrators, CSUSA, parents, and staff,  contributing to high turnover among the School Administrators for the schools.

78.     In August 2024, BCEA's board of directors adopted a "School Administrator Personnel Policy" (the "Administrator Policy"), that, in direct contravention of the Management Agreements, purported to require that the Board "directly participate in the hiring, selection, instruction, discipline, compensation, and termination of the School Administrator."  Remarkably, the policy acknowledges that the Management Agreements require the School Administrators must be directly employed and supervised by CSUSA. Despite this, BCEA purported to use the Administrator Policy as a means to unilaterally amend the terms of the Management Contracts, without CSUSA's agreement, based on what it claimed was its "ultimate authority over its charter schools." A true and correct copy of BCEA's purported Administrator Policy is attached hereto as **Exhibit D**.

79.     On August 14, 2024, Weinberg sent a letter to CSUSA purporting to issue a "contractual directive" that CSUSA assent to the Administrator Policy.

80.     On September 5, 2024, CSUSA responded, explaining the reasons it would not agree to amend the Management Agreement and that BCEA was not entitled to unilaterally amend those agreements to change who the School Administrators report to without CSUSA's agreement.

81.     BCEA, however, refused to respect the terms of the Management Agreement and instead reached an agreement with CIE to purportedly amend the Charter Contracts for MSE and BPA to require that the School Administrators must be directly employed by the schools' board (the "Charter Amendments").

82.     BCEA's request that CIE approve the Charter Amendments was a transparent and bad faith effort to circumvent the terms of the Management Agreements.  In making the request, BCEA intended to deny CSUSA the benefit of the terms it had negotiated, as well as the benefit as a Management Agreements whole, by, among other things, denying CSUSA the authority to ensure MSE and BPA are managed in a way that meets CSUSA's obligations under the Management Agreements.

83.     CIE's motive in approving the Charter Amendments was similarly clear.  It represents yet another attempt by CIE to misuse its purported position as Sponsor to interfere with the contracts between management companies and the charter schools it is supposed to see so it can sell its own, competing services.

84.     Indeed, CIE did not wait even a full day to capitalize on its effort to use the Charter Amendments to eliminate CSUSA. CIE informed BCEA that it had approved the Charter Amendments on November 21, 2024, in a letter transmitted by email.  At approximately 11:30 a.m. that same day, Ashley Epperson, CIE's Chief of Communications, sent an email to MSE,

following up on previous conversations and attaching a proposal to sell MSE marketing services in exchange for $1,000 a month. A true and correct copy of Epperson's email and CIE's marketing proposal are attached hereto as **Exhibit E.**

85.     Upon information and belief, BCEA has since approved CIE's marketing proposal in closed session, in violation of FOIA. As a result, BCEA has directed CSUSA to remove budgeted amounts for marketing services CSUSA was contracted to provide MSE and BPA.

86.     BCEA, for its part, has continued to use the invalid Charter Amendments it wrongfully procured in cooperation and concert with CIE as a supposed justification to declare CSUSA in default and to terminate the Management Agreements.

87.     On January 13, 2025, BCEA sent CSUSA a letter asserting CSUSA materially breached the Management Agreements by refusing to cooperate with BCEA's Administrator Policy and the invalid Charter Amendments. BCEA then threatened to terminate the Management Agreements, effective June 30, 2025 (the end of the schools' fiscal year), if CSUSA does not "cure" this supposed breach within the 60-day notice and cure period provided under the agreements. A true and correct copy of Weinberg's January 13, 2025 letter is attached hereto as **Exhibit F**.

88.     Contrary to BCEA's assertions, CSUSA has not breached the Management Agreements by continuing to supervise and direct the School Administrators, nor is CSUSA required to "transfer" employment and control of the School Administrators to BCEA.

89.     First, CIE's approval of the Charter Amendments (and indeed the underlying Charter Contracts it has purported to enter with MSE and BPA), are invalid because CIE does not legally qualify as a Sponsor under the Act.

90.     In addition, BCEA's wrongful procurement of the Charter Amendments represents a violation of the Management Agreements. As explained above, the Management Agreements

expressly provide that the School Administrators shall be CSUSA employees and that CSUSA shall have authority to supervise them. Although the agreements generally provide that nothing therein is meant to contradict the terms of the Charter Contracts issued by the Sponsor, the agreements, as interpreted by the implied covenant of good faith and fair dealing, do not contemplate that BCEA would procure amendments that thwart material terms of the Management Agreements and deny CSUSA the benefit of the terms to which the parties agreed. It is thus BCEA, rather than CSUSA, that has breached the terms of the Management Agreements.

91.     Further, BCEA's procurement of the Charter Amendments constitutes an act in conspiracy with CIE in furtherance of CIE's efforts to unfairly compete with CSUSA and interfere with its contractual relations, and accordingly the Charter Amendments are unenforceable and void.

92.     On March 13, 2025, CSUSA once again responded to BCEA, and demanded that it immediately retract its wrongful attempt to terminate the Management Agreements. A true and correct copy of that response is attached hereto as **Exhibit G**.

93.     In addition to interfering with CSUSA's supervision of the School Administrators, BCEA and CIE have wrongfully conspired to manufacture other, pretextual grounds to terminate the Management Agreements.

94.     On October 11, 2024, Weinberg sent another letter to CSUSA, this time claiming CSUSA was in default under its MSE Management Agreement because it had failed to fulfill its obligations related to the management of federal grants. In the letter, Weinburg asserted that "using reliable information provided to us by the sponsor"—meaning CIE—BCEA had determined "a potential sum of $505,068.07 has been lost between FY 19 and FY 24." The letter then threatened BCEA would proceed with its remedies under the MSE Management Agreement unless it received

a "satisfactory response and cure" within the agreements' 60-day notice and cure period. A true and correct copy of Weinberg's October 11, 2024 letter is attached hereto as **Exhibit H**.

95.     Despite its assertions, BCEA did not provide any documentation supporting the claims in Weinberg's October 11, 2024, letter. After repeated requests—including a letter invoking CSUSA's rights to obtain public records under FOIA—BCEA finally produced an excel spreadsheet prepared by CIE that purported to list federal funding CSUSA had allegedly "lost."

96.     In fact, CIE's calculations, as well as CSUSA's review of its own records, showed that CIE and BCEA's assertions in the October 11, 2024, letter were false. To the contrary, CSUSA secured nearly $2 million in federal grant funds for MSE and achieved a grant utilization rate of 95-99% during the fiscal years in question. This is well within, and indeed exceeds, industry norms. Federal grants can only be used for specific purposes, not all of which a school may need, and thus it is typical for schools to not use all available grant funding.

97.     CSUSA accordingly responded on December 6, 2024, explaining that it had fully performed its obligations under the Management Agreements. A true and correct copy of that response is attached hereto as **Exhibit I**.

98.     Despite CSUSA's response and full compliance with its obligations under the Management Agreements, BCEA has continued to assert that CSUSA is in default under the agreements and to use its management of federal grants as a pretext for termination.

99.     Since procuring BCEA's breach of its management agreements with CSUSA, CIE has sought to reward BCEA—recently announcing that CIE has helped BCEA secure financing for the construction of new facilities at WJSE and that it has "awarded" BCEA a $100,000 grant, paid out of state funds CIE has collected in its role as a purported Sponsor. Upon information and

2:25-cv-01852-BHH    Date Filed 03/14/25    Entry Number 1    Page 22 of 27

belief, these actions represent a *quid pro quo* in exchange for BCEA's cooperation with CIE's efforts to oust CSUSA as a competitor in the market for charter management services.

<u>COUNT 1</u>
**(Declaratory Judgment—CIE is Not a Valid Sponsor Under the Act)**

100.    CSUSA repeats incorporates each and every allegation contained in the foregoing paragraphs as if fully stated herein.

101.    Under the Act, charter schools must operate "by sponsorship of a public school district, the South Carolina Public Charter School District, or a public or <u>independent institution of higher learning</u> . . . ." S.C. Code. Ann. § 59-40-40(1) (emphasis added).  To qualify as a "Sponsor" under the Act, an independent institution of higher learning must meet the definition set forth in forth in S.C. Code Ann. § 59-113-50.  *See* S.C. Code. Ann. § 59-40-40(4) (defining "Sponsor" to include "an independent institution of higher learning as defined in Section 59-113-50).

102.    Section 59-113-50 of the South Carolina Code defines "an independent institution of higher learning" as either an "independent eleemosynary junior or senior college in South Carolina whose major campus and headquarters are located within South Carolina and which is accredited by the Southern Association of Colleges and Secondary Schools" or an "independent bachelor's level institution chartered before 1962 whose major campus and headquarters are located within South Carolina."

103.    Section 59-40-40(4) of the Act further states, "Only those public or independent institutions of higher learning, as defined in this subsection, who register with the South Carolina Department of Education may serve as charter school sponsors."

104.    CIE, however, is not an institution of higher learning as defined in Section 59-113-50.

105.    A real and present controversy thus exists as to the authority of CIE to serve as a charter school Sponsor under the Act, and accordingly, CSUSA is entitled to a declaratory judgment that (1) CIE is not a lawful Sponsor under the Act and (2) actions taken by CIE in its purported role as "Sponsor," including the approval and issuance of charters for MSE and BPA, and the approval of the Charter Amendments, were *ultra vires* and void.

**COUNT 2**
**(Breach of Contract as to BCEA)**

106.    CSUSA repeats incorporates each and every allegation contained in the foregoing paragraphs as if fully stated herein.

107.    This count is against BCEA only.

108.    The Management Agreements between BCEA and CSUSA constitute valid and enforceable contracts.

109.    BCEA, has breached both the express and implied terms of the Management Agreements, by and among other things: (i) purporting to terminate the Management Agreements without justification; (ii) interfering with CSUSA's supervision of the School Administrators for MSE and BPA; (iii) hampering and preventing CSUSA from performing its obligations under the agreements; and (iv) soliciting and procuring, in concert with CIE, amendments to the Charter Contracts for MSE and BPA that purport to alter, and effectively deny CSUSA the benefit of, the material terms of the agreements.

110.    BCEA has taken the actions described above in bad faith.

111.    As a direct and proximate result of BCEA's breach of the Management Agreements, CSUSA has been damaged and is therefore entitled to a judgment in an amount in excess of $75,000 to be proven at trial.

## COUNT 3
### (Tortious Interference with Contractual Relations as to CIE)

112.    CSUSA repeats incorporates each and every allegation contained in the foregoing paragraphs as if fully stated herein.

113.    This count is against CIE.

114.    CIE had knowledge of the Management Agreements between BCEA and CSUSA, as well as the fact that they were binding and enforceable agreements.  Indeed, as the purported Sponsor of MSE and BPA, CIE had intimate knowledge of the details and workings of MSE and BPA as well as the Management Agreements.

115.    Nevertheless, CIE intentionally interfered with CSUSA's management of MSE and BPA, as well as its contractual relationship with BCEA, and thus procured CEA's breach of the management agreement through the conduct alleged above.

116.    CIE actions have resulted in, or will result in, the loss of the Management Agreements and/or the benefits due CSUSA thereunder.

117.    As a direct and proximate result of CIE's willful, reckless, and malicious actions, CSUSA has suffered damages, and is accordingly entitled to a judgment against CIE for actual, consequential, and punitive damages in an amount in excess of $75,000 to be determined at trial.

## COUNT 4
### (Tortious Interference with Prospective Economic Advantage as to CIE)

118.    CSUSA repeats incorporates each and every allegation contained in the foregoing paragraphs as if fully stated herein.

119.    This count is against CIE.

120.    CSUSA had an economic relationship with BCEA which resulted in an expectancy of future benefit and economic advantage to CSUSA flowing from, among other things, the future development and management of RHPA.

24

121.    As the purported Sponsor of MSE and BPA, CIE had intimate knowledge of CSUSA's economic relationship with BCEA and the prospective economic advantage inuring to CSUSA as a result.

122.    CIE acted intentionally, and in a manner designed to disrupt CSUSA's economic relationship with BCEA and deny CSUSA the prospective economic advantage flowing from that relationship.

123.    CIE did, in fact, disrupt CSUSA's economic relationship with BCEA, resulting in economic harm to CSUSA.

124.    As a direct and proximate result of CIE's willful, reckless, and malicious actions, CSUSA has suffered damages, and is accordingly entitled to a judgment against CIE for actual, consequential, and punitive damages in an amount in excess of $75,000 to be determined at trial.

## COUNT 5
### (Violation of the South Carolina Unfair Trade Practices Act as to CIE)

125.    CSUSA repeats incorporates each and every allegation contained in the foregoing paragraphs as if fully stated herein.

126.    This count is against CIE.

127.    CIE willfully engaged in unfair and deceptive practice through all of the conduct through all of the conduct alleged herein.

128.    CIE's actions were conducted in trade or commerce.

129.    CIE's unfair and deceptive practices affect the public interest and have the potential for repetition as evidenced by CIE's repeated efforts to interfere and unfairly compete with the management companies serving the charter schools CIE purports to sponsor.

130.    As a direct and proximate result of CIE's actions, CSUSA has suffered actual and ascertainable damages and is accordingly entitled to a judgment against CIE in an amount in excess of $75,000 to be proven at trial, in addition to an award of its reasonable attorney's fees and costs.

**COUNT 6**
**(Civil Conspiracy as to All Defendants)**

131.    CSUSA repeats incorporates each and every allegation contained in the foregoing paragraphs as if fully stated herein.

132.    This count is to all Defendants.

133.    The Defendants, with the intent to (i) injure CSUSA through their acts of unlawful competition, (ii) procure and induce BCEA to breach the Management Agreement, (iii) interfere with CSUSA's prospective economic advantages, and (iv) engage in unfair and deceptive trade practices, acted in combination and in concert bringing about the events that could only have been accomplished by working together, close in time.

134.    This combination of acts resulted in actual damages to CSUSA in the form of lost past and future revenue, and in other particulars to be shown at trial.

**WHEREFORE**, CSUSA prays that a jury trial be had on all issues so triable and that the Court:

a) Issue a declaratory judgment that CIE is not a lawful Sponsor under the Act, and that actions taken by CIE in its purported role as "Sponsor," including the approval and issuance of charters for MSE and BPA, and the approval of the Charter Amendments sought BCEA, were ultra vires and void;

b) Enjoin CIE from (i) further purporting to act as Sponsor, (ii) taking further acts to interfere with the CSUSA's contractual relationships under the Management

Agreements or unlawfully compete against it; and (iii) direct that the charters for MSE, BPA, and WJSE be transferred to a valid Sponsor.

c) Enter a monetary judgment against BCEA and CIE awarding CSUSA actual, consequential and punitive damages in an amount to be proven at trial; and

d) Assess the costs and expenses of this action against Defendants and grant CSUSA an award against CIE for its reasonable attorneys' fees.

e) Grant such other and further relief as the Court deems just and proper.

This, the 14th day of March, 2025.

WOMBLE BOND DICKINSON (US) LLP

By: */s/M. Todd Carroll*
M. Todd Carroll (Fed ID No. 9742)
Todd.Carroll@wbd-us.com
1221 Main Street, Suite 1600
Columbia, SC 29201
803.454.7730

Molly McDermid (Fed ID No. 13459)
Molly.McDermid@wbd-us.com
5 Exchange Street / P.O. Box 999
Charleston, SC 29402
843.720.4650

Attorneys for Plaintiff, Charter Schools USA at Berkeley, LLC